649 P.2d 396

**Carl V. NICHOLSON and Thomas T. Nicholson, also known as Tommy T. Nicholson, Plaintiffs-Respondents,**

v.

**Carl E. NICHOLSON, in his capacity as personal representative of the Estate of Kate Nicholson, Deceased, Defendant-Cross Defendant-Respondent,**

and

**Kathryn (Nicholson) Gamble, Defendant-Cross Claimant-Appellant.**

**No. 14055.**

Court of Appeals of Idaho.

Aug. 4, 1982.

Robert M. Turnbow and Richard A. Riley, Eberle, Berlin, Kading, Turnbow & Gillespie, Boise, for defendant-cross claimant-appellant.

Alfred C. Hagan, Langroise, Sullivan & Smylie, Boise, for plaintiff-respondents.

WALTERS, Chief Judge.

This appeal involves the question whether there exist certain debts that represent assets of the estate of Kate Nicholson, deceased. Mrs. Nicholson died in 1978. During administration of the Nicholson estate in the magistrate division of the district court, Kathryn Gamble, daughter of the decedent and a residuary devisee of the estate, formally demanded that Carl E. Nicholson, the decedent's son and personal representative of the estate, collect sums allegedly due to the decedent from Carl V. and Thomas T. Nicholson, the sons of Carl E. Nicholson and grandsons of the decedent. The grandsons instituted this action in district court for declaratory judgment, seeking a determination that they were not indebted to the decedent as alleged by the daughter. The district court granted summary judgment in favor of the grandsons. The daughter appeals, contending that sum-

mary judgment was improper because there exist genuine issues of material fact. We agree with the daughter, reverse the summary judgment, and remand for further proceedings.

In 1956, Kate Nicholson sold her one-half interest in a livestock business to the grandsons by a written contract. Carl E. Nicholson, Kate's son, was the owner of the other half of the livestock operation. By the terms of this agreement, the grandsons were to pay Mrs. Nicholson the sum of $160,418.27 in ten equal annual installments together with interest of 5% per annum, with the payments beginning in 1956. The annual payments were made to her during the first four years following execution of the contract. The livestock business, which was operating either as Nicholson Sheep Company or as Nicholson and Sons, a partnership, made each of the four payments with a check signed by the son. The daughter contends that the balance, representing six payments, plus interest, is still outstanding. With exception of the first four payments, there is no evidence that any further payments were ever made on the contract.

The daughter also claims that Mrs. Nicholson loaned $33,000 to the grandsons in 1957. There is no evidence in the record to show what were the terms of payment, who were the correct obligors, or whether any payments were ever made by any party on this "loan".

These two alleged debts—the 1956 contract and the 1957 loan—are the sums the daughter demanded the son collect as personal representative of Kate Nicholson's estate. The grandsons denied that any debts were still owed. The limited discovery that occurred prior to summary judgment establishes the following facts pertinent to this dispute.

In December, 1976, during year-end tax planning, the attorney for C. E. Nicholson and Sons, Inc., successor corporation to the livestock partnership, learned of the 1956 contract. The attorney visited Mrs. Nicholson at her home that same day to ascertain the status of the contract. She was then ninety-six years of age. The attorney testified by deposition as follows:

A. I went out to her house. And I asked her at that time what the status of the contract was where—and I use these words because that's the words she used—the two boys bought her interest in the sheep company.

See, I had known Mrs. Nicholson before and she always referred to Tom and Carl as the two boys.

Q. You're referring to her grandsons.

A. Right. She had several other grandchildren, and she usually referred to them by name. So I asked her, anyway, as I said, about what the status was of that particular contract. And I remember we were sitting in her dining room.

And she said, 'It's been paid.' And to my recollection, those are her exact words.

I asked if she would sign a document that said that, which she informed me that she would....

Following this visit, the attorney returned to his office and drafted "Exhibit B", which reads as follows:

### RECEIPT AND ACKNOWLEDGMENT

KNOW ALL MEN BY THESE PRESENTS that I Kate Nicholson, a widow, of Boise, Ada County, State of Idaho, do hereby certify that all sums of money due to me from Thomas T. Nicholson and Carl V. Nicholson, or either of them, whether heretofore evidenced by contract, written or oral, or in any other manner whatsoever, have been fully paid, satisfied and discharged.

IN WITNESS HEREOF I have hereunto subscribed my name this 22nd day of December, 1976.

/s/   Kate Nicholson

He returned to Mrs. Nicholson's house the following day, asked her to read "Exhibit B" carefully, and asked her if she understood what it meant. She responded that she "certainly did" understand it. She then signed the document.

"Exhibit B" does not specifically mention either the 1956 contract or the 1957 loan, but ostensibly acknowledges satisfaction of all debts. In this regard the attorney testified:

Q. [T]he document itself does not refer to the contract you had been discussing, which is the 1956 contract, as I understand it.

A. Right.

Q. Is there any reason why it didn't refer to that contract specifically?

A. I didn't have a copy of that contract at that time. Let me explain, if I could. The first time I ever heard about this contract was the day before when we were talking about some other problems with the family.

Q. That is the first time you had ever heard of the 1956 contract?

A. Right.

\* \* \* \* \* \*

Q. But to your recollection, she did not direct you to prepare the document in question to refer to any and all contracts, but to her understanding was primarily related to the 1956 contract?

A. That was the main substance of our discussion, yes.

Notwithstanding "Exhibit B" and the testimony that Mrs. Nicholson understood the 1956 contract debt to be paid, there is no evidence of any payments actually made on that contract after the first four years. The son explained, by way of deposition, that an oral agreement had been made in 1960 to modify the terms of the 1956 contract. Circumstances in the livestock business, prior to the time when the 1960 installment payment was due, convinced him that the operation could not continue generating funds to pay his mother without liquidating some assets. According to the son, Mrs. Nicholson concurred. He said: "We made an agreement at that time that we would pay her not less than $5000.00 a year for her life and take care of her forever and pay all of her bills, hospital bills, doctor bills if she needed help, which was what she wanted. She wanted security." For the purposes of this appeal the parties refer to this new arrangement as the "annuity agreement." The grandsons, who were the purchasers of the one-half interest in the livestock operation, were not present when the son negotiated this annuity agreement. A handwritten ledger prepared by the son appears to show that a total of $5000 was paid to Mrs. Nicholson, or spent on her behalf, each year for several years.

The daughter contends that the annuity agreement was never fully performed. She points to the lack of evidence that any payments were made to Mrs. Nicholson in the years 1960–1967, 1969–1971, and 1975. The daughter also contends that Mrs. Nicholson mistakenly believed that her son, rather than the grandsons, was responsible for the 1956 contract, and that "Exhibit B" was signed under this mistaken belief.

■ The district court granted summary judgment to the grandsons, specifically decreeing that there were no sums due and owing to the estate on the 1956 contract. The only records before the court were the depositions of the three Nicholsons and the attorney, and the affidavit with supporting exhibits of the daughter. The district court relied upon *Marysville Development Co. v. Hargis*, 41 Idaho 257, 239 P. 522 (1925); *Finlayson v. Harris*, 49 Idaho 697, 291 P. 1071 (1930); and *Werry v. Goodman*, 78 Idaho 298, 301 P.2d 1111 (1956). The rule of law common to those cases—which we will call the *Marysville* rule—is as follows: Where an agreement to discharge a debt by the payment of a smaller sum than is due is fully executed, and such discharge is evidenced by a written receipt for the lesser sum in full satisfaction of the greater, there is a valid and irrevocable discharge of the debt. Implicit in the district court's order granting summary judgment—based on the *Marysville* rule—is the conclusion that there remains no material issue of fact and that the *Marysville* rule was satisfied as a matter of law.

■ In order for the *Marysville* rule to apply to this case, the annuity agreement must have been established as a valid agreement to discharge the debt on the

1956 contract for a smaller sum; and the terms of the annuity agreement must have been fully executed. In addition there must have been a valid written receipt evidencing discharge of the debt. To justify entry of a summary judgment, there must have been no genuine issue of material fact concerning these *Marysville* requirements. I.R.C.P. 56(c). However, from our review of the record, too many questions regarding the annuity agreement remain unanswered for us to conclude that the *Marysville* rule is applicable as a matter of law. The record leaves unanswered the source of Carl E. Nicholson's authority to accomplish a modification of the 1956 contract, to which he was not a party; assuming such authority, it leaves unanswered the exact terms of the annuity agreement—which appear ambiguous at best from the son's statement regarding his 1960 oral agreement with Mrs. Nicholson; and it leaves unanswered whether the terms of the annuity agreement were fully performed. We simply are unable to say, on the present record, that no genuine issue of material fact exists in regard to these matters. Liberally construing the evidence now in the record, and reasonable inferences therefrom, in favor of the daughter, we conclude that genuine issues of material fact exist regarding the status of the 1956 contract, which preclude the award of summary judgment in this case. I.R.C.P. 56(c).

As regards the 1957 loan, there is no evidence to show whether any payments were ever made on it, what its terms of payment were, to whom the loan was made, or whether it too was modified by the annuity agreement. The grandsons have never denied existence of the loan. We conclude that a genuine issue exists as to whether the loan is in fact due from the grandsons to the estate. Finally, because there is no evidence that Mrs. Nicholson intended "Exhibit B" to encompass the 1957 loan nor evidence of any payments made to or accepted by her on that loan, the *Marysville* rule of law applied by the district court is inapposite to that transaction.

Accordingly, we reverse the summary judgment and remand the case for further proceedings. Costs to appellant; no attorney fees allowed.

BURNETT and SWANSTROM, JJ., concur.